COOLEY LLP
HEIDI L. KEEFE (178960)
(hkeefe@cooley.com)
MARK R. WEINSTEIN (193043)
(mweinstein@cooley.com)
MATTHEW J. BRIGHAM (191428)
(mbrigham@cooley.com)
LOWELL D. MEAD (223989)
(lmead@cooley.com)
BENJAMIN S. LIN (232735)
(blin@cooley.com)
MARK A. ZAMBARDA (314808)
(mzambarda@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)
MATTHEW D. CAPLAN (260388)
(mcaplan@cooley.com)
101 California Street
San Francisco, CA 94111-5800
Telephone: (415) 693-2000
Facsimile: (415) 693-2222

Attorneys for Plaintiff
FACEBOOK, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| FACEBOOK, INC.,<br>a Delaware corporation,<br><br>        Plaintiff,<br><br>      v.<br><br>BLACKBERRY LIMITED,<br>a Canadian corporation, and<br>BLACKBERRY CORPORATION,<br>a Delaware corporation,<br><br>        Defendants. | Case No. 4:18-cv-05434-JSW<br><br>**FACEBOOK, INC.'S OPENING<br>CLAIM CONSTRUCTION BRIEF**<br><br>Hearing Date: October 24, 2019<br>Time: 10:00 a.m.<br>Courtroom: 5, 2nd Floor<br>Before: The Honorable Jeffrey S. White |

# TABLE OF CONTENTS

| | | Page |
|---|---|---|
| I. | LEGAL STANDARDS | 1 |
| II. | U.S. PATENT NO. 6,356,841 | 1 |
| | 1. "central location" (claims 12 and 23) | 1 |
| III. | U.S. PATENT NO. 6,744,759 | 3 |
| | 2. "feature" / "feature enhancement" (claims 4 and 8) | 3 |
| | 3. "data network telephone" (claims 4 and 8) | 5 |
| IV. | U.S. PATENT NO. 7,228,432 | 8 |
| | 4. "dedicated security processor" (claim 1) | 8 |
| V. | U.S. PATENT NO. 7,302,698 | 9 |
| | 5. "operating state" (claim 1); "operational state" (claim 20) | 10 |
| | 6. Preamble of claim 20 | 11 |
| VI. | U.S. PATENT NO. 7,567,575 | 13 |
| | 7. Order of method steps (claim 1) | 13 |
| | 8. "multimedia data delivery information" (claim 1) | 14 |
| | 9. "mobile device transmission profile" (claim 1) | 16 |
| VII. | U.S. PATENT NO. 8,429,231 | 17 |
| | 10. "generic signaling interface channel" (claim 1) | 18 |

Cooley LLP
Attorneys At Law
Palo Alto

4:18-cv-5434-JSW

i.

FACEBOOK'S OPENING
CLAIM CONSTRUCTION BRIEF

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Med. Sys., Inc. v. Biolitec, Inc.*,
   618 F.3d 1354 (Fed. Cir. 2010)................................................................13

*BASF Corp. v. Johnson Matthey, Inc.*,
   875 F.3d 1360 (Fed. Cir. 2017)................................................14, 15, 16

*Chrimar Sys. Inc v. Cisco Sys. Inc.*,
   No. C 13-01300 JSW, 2015 WL 1250106 (N.D. Cal. Mar. 18, 2015) ..........................1

*Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*,
   838 F.3d 12243 (Fed. Cir. 2016)................................................................16

*Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*,
   243 Fed. App'x 603 (Fed. Cir. 2007)................................................................13

*Duncan Parking Techs., Inc. v. IPS Grp.*,
   914 F.3d 1347 (Fed. Cir. 2019)................................................................7

*Eidos Display, LLC v. AU Optronics Corp.*,
   779 F.3d 1360 (Fed. Cir. 2015)................................................................16

*Finjan, Inc. v. Secure Computing Corp.*,
   626 F.3d 1197 (Fed. Cir. 2010)................................................2, 5, 8, 17

*Freeman v. Delta Air Lines, Inc.*,
   No. C 13-04179 JSW, 2015 WL 5609996 (N.D. Cal. Sept. 24, 2015)..........................1

*Genentech, Inc. v. Chiron Corp.*,
   112 F.3d 495 (Fed. Cir. 1997)................................................................13

*Georgetown Rail Equip. Co. v. Holland L.P.*,
   867 F.3d 1229 (Fed. Cir. 2017)................................................................11, 12

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
   755 F.3d 1367 (Fed. Cir. 2014)................................................... *passim*

*Klaustech, Inc. v. Google, Inc.*,
   No. C 10-05899 JSW, 2016 WL 2957044 (N.D. Cal. May 23, 2016)..........................1

*MasterObjects, Inc. v. Yahoo!, Inc.*,
   No. C 11-02539 JSW, 2013 WL 6185475 (N.D. Cal. Nov. 26, 2013)..........................1

*NTP, Inc. v. Research in Motion, Ltd.*,
   418 F.3d 1282 (Fed. Cir. 2005)................................................................4

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
521 F.3d 1351 (Fed. Cir. 2008)................................................................................5, 8

*Openwave Sys., Inc. v. Apple Inc.*,
808 F.3d 509 (Fed. Cir. 2015)......................................................................7, 11, 17, 19

*PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*,
815 F.3d 747 (Fed. Cir. 2016)...................................................................................11

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005)...................................................................................1

*Simpson Strong-Tie Co. v. Oz-Post Int'l, LLC*,
373 F.Supp.3d 1288 (N.D. Cal. 2019) (Orrick, J.) .........................................................4

*Summit 6, LLC v. Samsung Elecs. Co.*,
802 F.3d 1283 (Fed. Cir. 2015)..........................................................................4, 8, 17

*Tessera, Inc. v. UTAC (Taiwan) Corp.*,
Case No. 5:10-cv-04435-EJF, 2015 WL 7720832 (N.D. Cal. Nov. 30, 2015)...........................13

*Thorner v. Sony Comput. Entm't Am. LLC*,
669 F.3d 1362 (Fed. Cir. 2012)............................................................................. *passim*

*TomTom, Inc. v. Adolph*,
790 F.3d 1315 (Fed. Cir. 2015)..........................................................................11, 12, 13

*X One, Inc. v. Uber Techs., Inc.*,
No. 16-CV-06050-LHK, 2017 WL 3581184 (N.D. Cal. Aug. 18, 2017) (Koh, J.)....................2, 3

Plaintiff Facebook, Inc. ("Facebook") respectfully submits this opening claim construction brief regarding the ten terms designated by the parties as disputed terms from the asserted claims of the six patents-in-suit.  (Dkt. No. 48 (attaching copies of the patents as Exs. C-H).)

As discussed herein, the disputed claim terms use ordinary words according to their plain and ordinary meanings.  BlackBerry's proposed constructions impermissibly attempt to import limitations from exemplary embodiments disclosed in the patent specifications.

## I.   LEGAL STANDARDS

As the Court is familiar with claim construction under *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) and its progeny,[1] this brief cites authority where pertinent to the disputed issues.

## II.   U.S. PATENT NO. 6,356,841

The '841 Patent teaches a system and related techniques for tracking mobile objects, such as vehicles, from a central location using Global Positioning System ("GPS") technology.  ('841, col. 1:33-67, 2:55-3:12.)

### 1.   "central location" (claims 12 and 23)

| Facebook's Proposal | BlackBerry's Proposal |
| --- | --- |
| No construction is necessary at this time. Alternatively, if construction is needed, "location that communicates with the remote unit and is different from the remote unit." | "a single location that receives, stores, and analyzes GPS and other data from remote units" |

The claims at issue recite a "central location" and a remote unit that is in communication with the "central location."  ('841, claims 12 and 23.)  This simple language – "central location" – does not require construction.  BlackBerry's proposed construction improperly seeks to inject limitations that are not required by the claim language or the remainder of the intrinsic evidence.

The '841 Patent uses the term "central location" according to its plain and ordinary meaning:

---

[1] *See*, *e.g.*, *Klaustech, Inc. v. Google, Inc.*, No. C 10-05899 JSW, 2016 WL 2957044 (N.D. Cal. May 23, 2016); *Freeman v. Delta Air Lines, Inc.*, No. C 13-04179 JSW, 2015 WL 5609996 (N.D. Cal. Sept. 24, 2015); *Chrimar Sys. Inc v. Cisco Sys. Inc.*, No. C 13-01300 JSW, 2015 WL 1250106 (N.D. Cal. Mar. 18, 2015); *MasterObjects, Inc. v. Yahoo!, Inc.*, No. C 11-02539 JSW, 2013 WL 6185475 (N.D. Cal. Nov. 26, 2013).

a location that is central in the sense that it can be in communication with one or more remote units. The specification uses the term with this meaning. ('841, col. 1:34-67 ("The invention provides a system that can monitor and track one or more remote units from a central location. . . ."), 2:65-3:12 (in a "preferred embodiment," information is collected from remote units and "transmitted directly to a central location" and "[t]he information is preferably collected at a central location and analyzed").) No construction is necessary. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1206-07 (Fed. Cir. 2010) (affirming district court that declined to construe the phrase "addressed to a client," leaving the claim language to "its plain and ordinary meaning").

During prosecution, the applicant confirmed the broad plain meaning of the claimed "central location" when amending the claims to recite "central location" instead of "central office": "While the 'central location' used in these claims could refer to or coincide with a 'central office,' as that term is understood in the field of telecommunications networks, none of the claims are so limited and *the central location could be any location that communicates with the remote unit and is different from the remote unit*." (Ex. 1, '841 file history, June 26, 2001 Amendment at 14 (emphasis added).) The applicant stated that this amendment was made only "to clarify the meaning of the claims." (*Id.*) Thus, if the Court determines that any construction is necessary at this time, "central location" should be defined as "location that communicates with the remote unit and is different from the remote unit."

BlackBerry's proposed construction, on the other hand, commits the cardinal sin of attempting to import unsupported limitations. First, BlackBerry improperly seeks to define the term as a "single" location. But that limitation is unsupported by the intrinsic evidence and would only confuse and mislead the jury. *X One, Inc. v. Uber Techs., Inc.*, No. 16-CV-06050-LHK, 2017 WL 3581184, at *11 (N.D. Cal. Aug. 18, 2017) (Koh, J.) (rejecting proposed construction because "it would be confusing and unhelpful to the jury"). The plain meaning of a "location" is not limited to a single point in space and can encompass various items distributed throughout a location. The specification confirms this understanding. In an example embodiment, the central location can be a "central office" that includes multiple different components that are distributed throughout the office (such as a "computer," a "server," and multiple communication devices), as shown in Figure 19 and discussed in the corresponding text. ('841, Fig. 19, 7:51-8:23.)

2.

Second, BlackBerry improperly seeks to require that the claimed "central location" necessarily "receives, stores, and analyzes GPS and other data from remote units." But nothing in the claim language or specification imposes these narrow functional requirements on the claimed "central location," especially in view of the broad meaning confirmed during prosecution.[2] *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1365-67 (Fed. Cir. 2012) (claim terms are generally given their ordinary meaning in context unless the patentee (1) "sets out a definition and acts as his own lexicographer," or (2) "disavows the full scope of a claim term either in the specification or during prosecution"). As an initial matter, the systems recited in claims 12 and 23 recite only a "remote unit," singular; they could employ multiple "remote units" but do not need to. Moreover, the claim language simply recites a "central location" – which is a *location* – and each asserted claim separately recites any additional functions that are to be performed with respect to that location. For example, claim 12 does not recite any limitation on the "central location" other than that it is in communication with a remote unit and the remote unit transmits GPS information to it. Nothing in claim 12 imposes the "stores" and "analyzes" requirements BlackBerry would impermissibly inject into the claims. Claim 23 likewise does not recite that the central location "stores" GPS data.

### III.    U.S. PATENT NO. 6,744,759

The '759 Patent describes techniques for providing user-configurable telephone service in a data network telephony system. ('759, col. 3:32-48.) The disclosed system and related functionality allows a service provider to enable users to select and modify user-configurable features for a data network telephone by using a web-based interface. (*Id.*, 16:1-39.)

### 2.    "feature" / "feature enhancement" (claims 4 and 8)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction is necessary at this time. | a telephony service provider offering or characteristic of a telephony service<br><br>"enhancement" means "an improvement" |

---

[2] In the parties' Joint Claim Construction Statement, BlackBerry also cites a response to an office action that was submitted four years after the '841 patent issued in a different patent prosecution. Nothing in that response, which discussed claims that are different from the asserted claims of the '841 patent, requires the meaning that BlackBerry would impose upon the '841 patent claims.

Claims 4 and 8 of the '759 Patent recite a system and method enabling a user to select a "feature" or "feature enhancement" to provision a data network telephone.  The ordinary words "feature" and "enhancement" do not require construction.  BlackBerry's proposed construction incorrectly seeks to limit these words to narrow meanings that are not required by the claim language or the remainder of the record evidence.

The claims use the words "feature" and "enhancement" consistent with their plain meanings, reciting that a user can select a "feature" or "feature enhancement."  ('759, claims 4 and 8.)  The specification similarly discusses, for example, that "[a] user may select features for temporary use" and that "features may be added to the registration/provisioning functions . . . or implemented as extensions to the registration functions." (*Id.*, col. 7:10-15, 11:8-28.)  A layperson jury will be readily capable of understanding these words in context, and no construction is needed.  *NTP, Inc. v. Research in Motion, Ltd.,* 418 F.3d 1282, 1311 (Fed. Cir. 2005) (claim construction "is not an obligatory exercise in redundancy") (citation omitted); *Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015) (declining to further construe a "straightforward term" that required no construction); *Simpson Strong-Tie Co. v. Oz-Post Int'l, LLC*, 373 F.Supp.3d 1288, 1301 (N.D. Cal. 2019) (Orrick, J.) (leaving claim language to "plain and ordinary meaning" where "an ordinary person skilled in the arts and a layperson can both understand" the language).

BlackBerry's contention that a "feature" must be limited to "a telephony service provider offering or characteristic of a telephony service" would improperly import limitations from exemplary embodiments in the specification.  *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("While we read claims in view of the specification, of which they are a part, we do not read limitations from the embodiments in the specification into the claims.") (citation omitted).  Nothing in the specification or prosecution history redefines the claimed "feature" with the narrow definition that BlackBerry proposes.

BlackBerry's proposal to narrowly redefine the ordinary word "enhancement" as "improvement" is similarly unsupported.  *Thorner*, 669 F.3d at 1366 ("we do not redefine words").  First, BlackBerry would only inject subjectivity and ambiguity, inevitably raising questions such as: "improvement" from whose perspective?  An improvement in the opinion of one person might be

considered a degradation by another person. Furthermore, the plain meaning of "enhancement" can encompass a change of a factor or variable that is not necessarily an "improvement." There are various uses of the word "enhance" that typically would not be considered "improvements" depending on one's perspective (*e.g.*, "enhance the injury").

### 3. "data network telephone" (claims 4 and 8)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction is necessary at this time. | A fixed communication device with an Ethernet communications interface for connection to an Ethernet port. |

Claims 4 and 8 recite functionality by which a user can select features to provision a "data network telephone." This ordinary language does not require construction. BlackBerry's construction impermissibly attempts to import limitations from exemplary embodiments in the specification.

In context, the plain and ordinary meaning of a "data network telephone" is a telephone that works with a data network, as opposed to a traditional old land-line telephone over an analog network. No construction is necessary. *Hill-Rom Servs.*, 755 F.3d at 1371 (reversing district court that narrowly construed the term "datalink," and determining that "'datalink' should be given its plain and ordinary meaning"); *Finjan*, 626 F.3d at 1206-07; *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) ("district courts are not (and should not be) required to construe *every* limitation present in a patent's asserted claims") (emphasis in original).

The specification reflects this ordinary meaning. The specification discusses embodiments involving "data network telephony" and "data network telephones" for use over a data network, such as the Internet. *See* '759, col. 3:32-40 ("The present invention addresses the above needs by providing a system in a data network telephony system, such as for example, the Internet, that provides a way for users to make brand new telephones usable without having to wait while the telephone company programs an account."); 5:5-6:46 (describing an exemplary data network telephony system); 9:66-67 (discussing how the "communication proceeds over the voice over data channel"). (*See also* Declaration of Dr. Robert Akl ("Akl Decl."), ¶¶ 35-41.) The term was also used consistent with this

1  meaning during prosecution, where the applicant distinguished certain cited references on the basis

2  that they not disclose provisioning a data network telephone using web access.

3       As one illustration of a "data network telephone" device, the specification describes voice

4  communication devices **108a** and **108b**, which are depicted in the form of devices that look like

5  electronic telephones in Figure 1. ('759, Fig. 1 (item **108a**, item **108b** (labeled "telephone")), col. 5:5-

6  47, 6:3-46, 6:50-7:15.) The specification describes that these exemplary data network telephones *may*

7  connect to a data network in various different ways, using various types of physical connection,

8  protocol, and wired or "wireless" connection. (*Id*., col. 6:27-46 ("The access networks **112**, **114** may

9  link to the voice communication device **108a** using an Ethernet LAN, a token ring LAN, a coaxial

10  cable links (e.g. CATV adapted for digital communication), a digital subscriber line (DSL), twisted

11  pair cable, fiberoptic cable, an integrated services digital network (ISDN) link, and wireless links")).)

12       BlackBerry's construction is not supported by the intrinsic evidence. Nothing in the claim

13  language, specification, or prosecution history disclaims all types of "data network" other than

14  Ethernet networks or requires that the claimed "data network telephone" must be a "fixed" device.

15  *Thorner*, 669 F.3d at 1365-67. BlackBerry's construction improperly uses language from the

16  specification's description of an example embodiment, namely data network telephones **208a** and

17  **208b** shown in Figure 2A: "The data network telephones **208***a*, *b* are Ethernet phones which are

18  telephones that include an Ethernet communications interface for connection to an Ethernet port."

19  ('759, col. 8:26-28.) But those examples are merely illustrative embodiments. While the specification

20  provides Ethernet as one example for the embodiment shown in Figure 2A, it makes clear that Ethernet

21  is merely an example: "The local area network **212** in FIG. 2A is an Ethernet LAN operating according

22  to the IEEE 802.3 specification, which is incorporated by reference herein, *however, any other type of*

23  *local area network may be used*." (*Id*., col. 7:32-36 (emphasis added); Fig. 2A (labeling local area

24  network "(*e.g.* Ethernet)").) The voice communication devices **108a** and **108b** shown in Figure 1 are

25  also example embodiments that the specification refers to as "data network telephone," which also do

26  not need to use Ethernet. (*Id*., col. 5:5-47, 6:3-46, 6:50-7:15.) (Akl Decl., ¶¶ 42-43.) *Hill-Rom*, 755

27  F.3d at 1371 ("we do not read limitations from the embodiments in the specification into the claims.").

28       BlackBerry also improperly seeks to import a limitation that a data network telephone must be

a "fixed" device based on one isolated sentence in the specification:

> The user interface circuitry **261** may support other hardware and software interfaces.  For example, a videophone implementation might also include a camera and monitor.  *The fixed communication device of the present invention is not limited to telephones or videophones* – additional user interface types, for example, such as the ones needed for computer games, are also contemplated as being within the scope of the present invention.

('759 Patent, col. 9:34-41 (emphasis added).)   But this brief discussion, which contains the only occurrence of the word "fixed" in the specification, falls far short of the type of clear, deliberate, and unambiguous disclaimer or redefinition that would narrow the scope of the claim term "data network telephone."   *Openwave Sys., Inc. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) ("[t]o find disavowal, we must find that the specification is 'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'") (citations omitted); *Thorner*, 669 F.3d at 1365-67 (discussing the "exacting" standards for finding lexicography or disclaimer).  The relied-upon sentence does not even use the claim term at issue – "data network telephone" – much less proclaim that every "data network telephone" used in connection with the claimed invention must necessarily be a "fixed" device.  (Akl Decl. ¶¶ 42-43.)

In fact, BlackBerry's proposed construction would impermissibly exclude the specification's disclosed embodiments of data network telephones, such as the voice communication devices **108a** and **108b** shown in Figure 1, that can use non-Ethernet connections and "wireless" links.  ('759, Fig. 1, 5:5-47; *id.*, col. 6:27-46 ("The access networks **112**, **114** may link to the voice communication device **108a** using an Ethernet LAN, a token ring LAN, a coaxial cable links . . ., a digital subscriber line (DSL), . . . an integrated services digital network (ISDN) link, and *wireless* links.") (emphasis added), 6:50-7:15 (noting that the devices in system **100** shown in Figure 1 are examples of "data network telephone"); *see also id.*, col. 8:17-21, 13:49-60 (discussing "telephony service for mobile users" and enabling "mobile clients to register with their current locations").)  (Akl Decl. ¶¶ 42-43.) It is well-settled that "a claim construction that excludes the preferred embodiment is rarely, if ever, correct and would require highly persuasive evidentiary support." *Duncan Parking Techs., Inc. v. IPS Grp.*, 914 F.3d 1347, 1364 (Fed. Cir. 2019) (citation and internal quotations omitted).

## IV.   U.S. PATENT NO. 7,228,432

The '432 Patent describes techniques for providing security for a computer system, such as by using a dedicated security processor to validate files for security purposes. ('432, col. 1:40-46.)

### 4.   "dedicated security processor" (claim 1)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction is necessary at this time. | a processor dedicated to providing security functions |

Claim 1 of the '432 Patent recites a method whereby a dedicated security processor receives a request for a file, is used to access the file, and validates the requested file. ('432, claim 1.) In context, no construction is needed. BlackBerry's proposed construction merely rearranges the undefined words of the claim and impermissibly attempts to inject functional requirements from one exemplary embodiment described in the specification.

A person of ordinary skill in the art would have understood "dedicated security processor," in the context of the claim language and specification, to have its plain and ordinary meaning. (Akl Decl., ¶¶ 44-46.) The claim language does not impose any particular structural requirements on the dedicated security processor, and the claim language explicitly specifies the functions that are performed using the dedicated security processor. ('432, claim 1.) The specification of the '432 Patent also does not disclaim any particular form that the dedicated security processor may take. *Thorner*, 669 F.3d at 1365-67. No construction is necessary. *Finjan*, 626 F.3d at 1206-07; *Summit 6*, 802 F.3d at 1291; *Hill-Rom Servs.*, 755 F.3d at 1371-72.

BlackBerry's proposed construction is unhelpful and improper. As an initial matter, BlackBerry's proposal mostly just repeats and moves around the same words from the claim language – "dedicated," "security," and "processor" – without providing any definition of those words. Claim construction is "a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *O2 Micro*, 521 F.3d at 1362 (citations omitted). BlackBerry fails to show that its proposed construction would provide guidance to a jury that is helpful, accurate, and necessary for

1   resolution of the issues in this case.

2         Furthermore, BlackBerry's construction also improperly attempts to impose a functional

3   requirement that the dedicated security processor must be "dedicated to providing security functions."

4   But the claim language itself specifies the functions that the "dedicated security processor" must be

5   capable of performing.  In asserted claim 1, the dedicated security processor receives a request for a

6   file, is used to access the file, and is used to validate the requested file. ('432, claim 1.)  Other claims

7   specify other functions.  (*E.g.*, '432, claims 26-29.)  There is no basis to inject an additional

8   requirement that the only thing the dedicated security processor can do is "providing security

9   functions." *Thorner*, 669 F.3d at 1365-67.

10        BlackBerry's proposed construction apparently borrows language from the specification's

11  description of an exemplary embodiment using a "security co-processor **111**" in the context of an

12  exemplary "computer system **100**" in order to illustrate one example of a security processor.  The

13  specification states: "the security co-processor **111** *may* be dedicated to providing security functions

14  to the computer system **100**." ('432, col. 4:15-17 (emphasis added); *see also id.*, col. 2:3-34 (making

15  clear that the specification's descriptions of embodiments with "a security co-processor" are merely

16  "disclosed embodiments").)  But the "security co-processor" embodiment is merely one exemplary

17  embodiment that does not limit the claims.  *Hill-Rom*, 755 F.3d at 1371-72.  Moreover, even in that

18  illustrative example, the specification states only that the security co-processor "*may*" be dedicated to

19  providing security functions to the exemplary computer system **100** embodiment.  The asserted claims

20  at issue are not limited to that exemplary embodiment, do not recite a "security co-processor," and do

21  not recite that the claimed security processor must be "dedicated to providing security functions."

22  There is no basis to import these un-recited limitations into the claims.  (Akl Decl. ¶ 47.)  *Thorner*,

23  669 F.3d at 1365-67.

24  **V.   U.S. PATENT NO. 7,302,698**

25        The '698 Patent teaches techniques for monitoring the "state" of a computing platform using

26  a monitoring component.  ('698, col. 7:18-26, 10:61-11:2.)

27

28

5.       "operating state" (claim 1); "operational state" (claim 20)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No separate construction necessary at this time beyond the agreed construction of "state." | a state running on the computing entity that can be distinguished from other states using a set of integrity metrics |

The '698 Patent explicitly defines the term "state" as "a mode of operation of the computing entity in which a plurality of functions provided by the computing platform may be carried out." ('698, col. 12:65-13:2.)  The parties agree that the term "state" has this construction.  (Dkt. No. 48 at 1.)

No further construction is required or appropriate for the phrases "operating state" or "operational state."  BlackBerry's proposed construction improperly seeks to import limitations from an exemplary embodiment into the claims.

The claim language is clear and understandable in view of the parties' agreed construction of "state" as a "mode of operation."  The claims recite, for example, that a monitoring component operates to determine which state is "the current operating state" (claim 1) or records data describing "a current operational state" (claim 20).  The specification describes "operating states" accordingly: "In the best mode for carrying out the invention, the computing entity has a plurality of *modes of operation, referred to herein as operating states*." ('698, col. 10:61-63 (emphasis added).)  Since the term "state" is already defined to mean a "mode of operation . . ." there is no reason to further construe "operating state" or "operational state."

BlackBerry's proposed construction attempts to add a limitation requiring that an operating or operational state "can be distinguished from other states using a set of integrity metrics."  The intrinsic evidence does not require this limitation.  The claims at issue do not recite any "integrity metrics," much less the use of integrity metrics to distinguish between operating states.

BlackBerry cites the summary of the invention section of the specification.  But that section only discusses "specific implementations" of the present invention:

> In *specific implementations* of the present invention, a computing entity is capable of residing in a plurality of distinct operating states. Each operating state can be distinguished from other operating states using a set of integrity metrics designed to distinguish between those operating states.

('698, col. 3:39-45 (emphasis added).)  Thus, in some "specific implementations," operating states can be distinguished using integrity metrics.  But those would be merely exemplary embodiments that do not limit the claims.  *Hill-Rom*, 755 F.3d at 1371-72.  In other alternative implementations, a system implementing the invention might not be capable of using integrity metrics.  The specification's discussions of "integrity metrics" do not provide any clear and deliberate disclaimer or redefinition of the term "operating state" or "operational state" that limits all implementations of the patent's claims.  *Openwave*, 808 F.3d at 513; *Thorner*, 669 F.3d at 1365-67.

The prosecution history confirms the absence of any deliberate disclaimer or redefinition.  The applicant filed a brief appealing from the examiner's rejection over certain prior art.  (Ex. 2, Mar. 21, 2007 Appeal Brief.)  In the brief, the applicant first summarized the subject matter described in the specification, including paraphrasing the summary of the invention section discussed above and providing the definition of "state."  (*Id*. at 2-3.)  Critically, the applicant relied only on this definition of "state" to distinguish the prior art.  (*Id*. at 13-14.)  The applicant did not rely on "integrity metrics" to distinguish the prior art.

### 6.    Preamble of claim 20

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| The preamble is not limiting except for "computer program" and "monitoring component having a second data processor and a second memory." | The phrase "a computer platform having a first data processor and a first memory and a monitoring component having a second data processor and a second memory" in the preamble of claim 20 is limiting |

The parties dispute whether certain portions of the preamble of claim 20 are limiting.  "Generally, the preamble does not limit the claims."  *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017) (citation omitted).  "The purpose of a preamble is to set forth the general nature of the invention being claimed.  It is generally not used as or intended to be a limiting factor in delineating boundaries of the scope of the invention as claimed."  *PPC Broadband, Inc. v. Corning Optical Commc'ns RF, LLC*, 815 F.3d 747, 753 (Fed. Cir. 2016).  Even where a portion of a preamble is shown to be limiting, the remainder of the preamble need not be limiting.  *TomTom*,

1    *Inc. v. Adolph*, 790 F.3d 1315, 1323-24 (Fed. Cir. 2015) ("That the phrase in the preamble 'destination

2    tracking system of at least one mobile unit' provides a necessary structure for claim 1 does not

3    necessarily convert the entire preamble into a limitation . . .").

4         Here, the preamble of claim 20 recites: "A method of storing data at a computing entity

5    comprising a computer platform having a first data processor and a first memory and a monitoring

6    component having a second data processor and a second memory, said method comprising the steps

7    of: . . ." ('698, claim 20.)  Neither party contends that the preamble language ". . . storing data at a

8    computing entity comprising . . ." is limiting.  The parties dispute, however, whether the preamble's

9    reference to a computer platform "having a first data processor and a first memory . . ." imposes a

10   limitation on the recited computer platform.  BlackBerry has not shown that this language imposes a

11   limitation as opposed to being merely an illustrative statement of intended use.

12        Significantly, claim 20 recites a method with a series of steps, not a physical apparatus with

13   specified structural components.  ('698 claim 20 ("method comprising the steps of . . .").)  The terms

14   "computer platform" and "monitoring component" in the preamble of claim 20 are limitations because

15   they provide antecedent basis for "the computing platform" and "the monitoring component" recited

16   later in the claim body.  (*See id.*)  Furthermore, during prosecution, the applicant and Examiner pointed

17   to the recitation of a "monitoring component having a second data processor and a second memory"

18   as a distinction over the cited prior art.  (*E.g.*, Ex. 2 at 19.)

19        However, BlackBerry has not shown that the preamble's recitation of a computer platform

20   "having a first data processor and a first memory . . ." imposes a limitation on the recited computer

21   platform.  The "first data processor" and "first memory" mentioned in the preamble are not recited in

22   the body of the claim and therefore do not provide necessary structure to the claimed method.

23   Language in the preamble is not limiting where the "patentee defines a structurally complete invention

24   in the claim body and uses the preamble only to state a purpose or intended use for the invention."

25   *TomTom*, 790 F.3d at 1323-24 (citation and internal quotation omitted) (holding that "the generating

26   language [in the preamble] is not limiting and does not provide an antecedent basis for any of the

27   claims"); *Georgetown Rail*, 867 F.3d at 1236-37 (affirming district court ruling that recitation in

28   preamble that a system is to be "mounted on a vehicle for movement along the railroad track" was not

limiting).   Here, every step of claim 20 can be practiced without requiring the claimed "computer platform" in the preamble (or the "computing platform" in the claim body) to have the "first processor" and "first memory" that are referenced in the preamble.   Thus, "the claim body describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention." *Am. Med. Sys., Inc. v. Biolitec, Inc.*, 618 F.3d 1354, 1358-59 (Fed. Cir. 2010) (citation omitted).   As in *TomTom*, claim 20 here recites a method requiring certain steps and "[a]ll of these steps are performed within the body" of the claim.   *TomTom*, 790 F.3d at 1324.

## VI.   U.S. PATENT NO. 7,567,575

The '575 Patent describes a system and related techniques for providing multimedia data to a mobile device using a mobile service platform.  ('575, col. 2:39-3:18.)

### 7.   Order of method steps (claim 1)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| The sequence of steps can be performed in any order, except that the step of "receiving a request…" is performed before the step of "providing multimedia data to the mobile device…" | The claim requires the step of "receiving a request from the mobile device" to occur before the subsequent limitations in the claim. |

Under Federal Circuit precedent, "unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one."  *Tessera, Inc. v. UTAC (Taiwan) Corp.*, Case No. 5:10-cv-04435-EJF, 2015 WL 7720832, at *8 (N.D. Cal. Nov. 30, 2015) (quoting *Altris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369 (Fed. Cir. 2003)).   "Absent affirmative indication to the contrary, method steps need not be performed in the order in which they are recited."  *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. App'x 603, 609 (Fed. Cir. 2007) (citing *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001)).

Claim 1 of the '575 Patent does not require its recited steps to be performed in any particular sequence.   The claim states that its method "compris[es]" certain steps and never indicates they must be carried out in a particular order.   *Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in claim language which means that the named elements

are essential, but other elements may be added and still form a construct within the scope of the claim.").  The only step-order imposed by claim 1 is that the step of "receiving a request from the mobile device" is performed before the step of "providing multimedia data to the mobile device *in response to the request*" as a matter of grammar and logic.  The remaining steps could be performed in various different orders.  (Akl Decl. ¶¶ 48-51.)

Nothing in the claim language or specification requires the step order that BlackBerry proposes, which would require that the step of "receiving a request from a mobile device" must be performed before all of the other steps recited in claim 1.  On the contrary, the specification explicitly states that the steps can be performed in various orders.  Figure 5 of the '575 Patent shows a flow diagram illustrating a series of steps, including steps that correspond to the steps in claim 1 such as "receive request from mobile device" (step **502**).  ('575, Fig. 5.)  After discussing Figure 5 and describing each step, the specification states: "It will be appreciated by those of ordinary skill in the art that unless otherwise indicated herein, *the particular sequence of steps described is illustrative only and can be varied without departing from the spirit of the invention*."  ('575, col. 12:35-57 (emphasis added).)  Other than the claimed step of providing multimedia media data "in response to the request," the remaining steps of claim 1 can be performed before or after the step of "receiving a request from a mobile device."  (Akl Decl. ¶ 52.)

### 8.    "multimedia data delivery information" (claim 1)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction necessary at this time. Alternatively, if construction is needed, "information relating to the delivery of multimedia data." | The phrase is indefinite |

Claim 1 recites a step of providing "multimedia data delivery information" to at least one multimedia server.  ('575, claim 1.)  These ordinary words – multimedia data delivery information – are used according to their plain and ordinary meanings, and the phrase does not require construction.  BlackBerry fails to carry its "burden of proving indefiniteness by clear and convincing evidence."

*BASF Corp. v. Johnson Matthey, Inc.*, 875 F.3d 1360, 1365 (Fed. Cir. 2017) (citation omitted).

As the plain claim language indicates, the step of providing "multimedia data delivery information" involves providing information relating to the delivery of multimedia data.  (Akl Decl. ¶ 54.)  The specification describes an example embodiment where a mobile service platform provides multimedia data delivery information to a multimedia server as part of a process for transmitting multimedia data to a mobile device.  In one technique illustrated in Figure 5, one of the steps is to "provide multimedia data delivery information" to a multimedia server.  ('575, Fig. 5 (step **524**).)  The specification describes: "At step **524**, the mobile service platform **340** provides multimedia data delivery information to the multimedia server **302** ...."  (*Id.*, 14:10-12.)  Next, the multimedia server invokes multimedia transcoding services based on a user profile, a device profile, and a transmission profile.  (*Id.* at 14:12-14.)  A media source controller then instructs a multimedia source to transfer multimedia content to a transcoder and the transcoded content is in turn delivered to the multimedia server and the mobile device.  (*Id.* at 14:19-38.)

In view of the specification's teachings, a person of ordinary skill in the art would have understood multimedia data delivery information to refer to information relating to the delivery of multimedia data, as the phrase plainly suggests.  (Akl Decl. ¶¶ 55-56.)  Examples of multimedia data delivery information that would have been familiar to a person of ordinary skill in the art included information used to specify the source and/or destination of multimedia data being transmitted, such as source and/or destination addresses; information regarding the time that multimedia data is being generated or time-to-live, such as a time/date field; and information about the size or type of multimedia data to be transmitted.  (*Id.*, ¶ 56.)

BlackBerry apparently contends that the claim language is indefinite because the specification does not provide details regarding multimedia data delivery information.  But "an inventor need not explain every detail because a patent is read by those of skill in the art."  *BASF*, 875 F.3d at 1366 (quoting *Wellman, Inc. v. Eastman Chem. Co.*, 642 F.3d 1355, 1367 (Fed. Cir. 2011)).  Here, the use of multimedia data delivery information was well within the grasp of a person of ordinary skill in the art.  (Akl Decl. ¶¶ 55-57.)  By comparison, in *Ethicon Endo-Surgery, Inc. v. Covidien, Inc.* the Federal Circuit reversed a district court's ruling that certain claimed "clamping pressure" limitations were

indefinite in part because the specification did not describe certain details.  796 F.3d 1312, 1316-22 (Fed. Cir. 2015).  The Court noted:  "If such an understanding of how to measure the claimed average pressures was within the scope of knowledge possessed by one of ordinary skill in the art, there is no requirement for the specification to identify a particular measurement technique."  *Id*. at 1319.  Likewise here, a skilled artisan would have understood the category of information at issue, and the specification need not spell out every detail.  *BASF*, 875 F.3d at 1366; *Ethicon*, 796 F.3d at 1319.

BlackBerry might also contend that the claim language is broad, encompassing any type of information relating to the delivery of multimedia data.  But "breadth is not indefiniteness."  *BASF* 875 F.3d at 1367 (quoting *SmithKline Beecham Corp. v. Apotex Corp.*, 403 F.3d 1331, 1341 (Fed. Cir. 2005)).  The patentee is free to claim multimedia data delivery information without limiting the claim to a particular narrow type of information.

In sum, BlackBerry fails to carry its burden to prove that this claim language is indefinite.  *See, e.g., Cox Commc'ns, Inc. v. Sprint Commc'n Co. LP*, 838 F.3d 1224, 1228–33 (Fed. Cir. 2016) (reversing district court ruling that the term "processing system" was indefinite); *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1365–68 (Fed. Cir. 2015) (reversing district court ruling that "a contact hole for source wiring and gate wiring connection terminals" was indefinite).

### 9.    "mobile device transmission profile" (claim 1)

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction necessary at this time. | a profile containing information that describes the wireless protocol used by a mobile device, including the wireless channel environment of the mobile device |

Claim 1 recites a step of obtaining a "mobile device transmission profile."  This is another term used with its plain and ordinary meaning.  BlackBerry's proposed construction improperly attempts to import limitations from an example embodiment in the specification.

The language of claim 1 recites the step of obtaining a "mobile device transmission profile" consistent with its plain meaning, *i.e.*, transmission profile for a mobile device.  The specification

1  similarly describes a step to "obtain a mobile device transmission profile" as one of the steps in

2  Figure 5.  ('575, Fig. 5; col. 14:19-23.)  A layperson jury will be able to understand this language in

3  context, and no construction is required.  (Akl Decl. ¶¶ 58-60.)  *Finjan*, 626 F.3d at 1206-07; *Summit*

4  *6*, 802 F.3d at 1291; *Hill-Rom Servs.*, 755 F.3d at 1371-72.

5          BlackBerry's proposed construction impermissibly attempts to import limitations from an

6  exemplary embodiment in the specification.  *Thorner*, 669 F.3d at 1366 ("We do not read limitations

7  from the specification into claims . . .");  *Hill-Rom*, 755 F.3d at 1371-72.  Nothing in the language of

8  claim 1 recites or requires that the mobile device transmission profile must describe the wireless

9  protocol used by a mobile device or wireless channel environment.  Instead, BlackBerry improperly

10 relies on an example in the specification.  In one example embodiment, a system illustrated in Figure

11 2 contains "transmission profile **306**" as one of its components.  ('575, col. Fig. 2 ("transmission

12 profile" item **306**).)  The specification indicates that in this Figure 2 embodiment, the "transmission

13 profile describes the protocol of the wireless channel environment."  (*Id.*, col. 7:11-13.)  But the

14 specification explicitly confirms that the system in Figure 2 merely illustrates "an exemplary

15 architecture."  (*Id.*, col. 6:9-11.)  Nothing in the specification or prosecution history provides a clear

16 and deliberate disclaimer or redefinition of the types of information that may be included in a mobile

17 device transmission profile.  (Akl Decl. ¶¶ 61-62.)  *Openwave*, 808 F.3d at 513 (disclaimer must be

18 "both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be

19 unambiguous evidence of disclaimer") (citations omitted); *Thorner*, 669 F.3d at 1365 ("To act as its

20 own lexicographer, a patentee must 'clearly set forth a definition of the disputed claim term' other

21 than its plain and ordinary meaning.") (citation omitted).

22         The specification does set forth an explicit definition of the term "personalized multimedia

23 service," showing that the patentee knew how to provide an explicit definition where desired.  ('575,

24 col. 4:29-34.)   But the specification does not provide any such definition for "mobile device

25 transmission profile," which further confirms that this language should be understood according to its

26 plain and ordinary meaning.

27 **VII.   U.S. PATENT NO. 8,429,231**

28         The '231 Patent describes a voice instant messaging system that enables voice communications

1  between users.  Among other features, the disclosed system can provide voice communication using

2  a generic signaling interface channel, a control channel, and an audio channel. ('231, col. 1:64-66.)

3          **10.      "generic signaling interface channel" (claim 1)**

| Facebook's Proposal | BlackBerry's Proposal |
|---|---|
| No construction necessary at this time. Alternatively, if construction is needed, "communication channel that can be used to establish an initial connection" | A channel used to establish an initial connection in which local IP addresses are exchanged, and then is no longer used. |

9          Claim 1 of the '231 Patent recites a method including a step of establishing voice

10  communication using more than one channel including a "generic signaling interface channel."  The

11  claims and specification use this language according to its plain and ordinary meaning.  BlackBerry

12  improperly seeks to import limitations from an exemplary embodiment in the specification.

13          Claim 1 refers to a "generic signaling interface channel" according to the plain and ordinary

14  meaning of these words, reflecting a channel that can be used to establish voice communication.  The

15  specification similarly describes the use of a generic signaling interface channel to establish voice

16  communication.  ('231, col. 1:64-66 ("[v]oice communication may be enabled by establishing a

17  generic signaling interface channel, a control channel, and an audio channel between the sender and

18  the recipient."); 13:27-60 ("In one implementation, a talk tool establishes an active talk session using

19  three communication channels: a Generic Signaling Interface (GSI) channel, a control channel, and an

20  audio channel.").)

21          To the extent the Court finds that any construction of this term is necessary, a person of

22  ordinary skill in the art would have understood that the generic signaling interface channel is a

23  communication channel that can be used to establish an initial connection.  (Akl Decl. ¶¶ 63-66.)  This

24  meaning is consistent with the operation of a generic signaling interface channel as recited in the claim

25  language and described in the specification.  ('231, col. 1:64-66 ("[v]oice communication may be

26  enabled by establishing a generic signaling interface channel, a control channel, and an audio channel

27  between the sender and the recipient."); 13:30-31 ("The talk tool uses the GSI channel to establish the

28

1    initial connection.").)

2        BlackBerry's proposed construction improperly imports limitations from one example

3    embodiment in the specification.  As an initial matter, BlackBerry would improperly limit the term to

4    a channel that necessarily "*is* used" to establish an initial connection, while the specification makes

5    clear that this channel "*can be* used" to establish an initial connection.  ('231, col. 1:64-66 ("[v]oice

6    communication *may be* enabled by establishing a generic signaling interface channel, a control

7    channel, and an audio channel between the sender and the recipient.") (emphasis added); 13:30-31.)

8    In other words, there is no basis to require that a generic signaling interface channel, by definition,

9    must necessarily be used to establish an initial connection.  Rather, one possible use of the generic

10   signaling interface channel is to enable voice communications by establishing an initial connection.

11   The generic signaling interface channel could also be used in other ways as a matter of implementation

12   design choice.  (Akl Decl. ¶¶ 67-68.)

13       More fundamentally, nothing in the claim language, specification, or prosecution history

14   narrowly disclaims or redefines a generic signaling interface channel to require the exchange of IP

15   addresses, or to require that the channel is "no longer used" after an initial connection, as BlackBerry

16   proposes.  *Openwave*, 808 F.3d at 513; *Thorner*, 669 F.3d at 1365-67.  The claim language does not

17   recite anything about IP addresses, and the final step of claim 1 is directed toward "establishing"

18   communication without imposing any limitation requiring that the generic signaling interface channel

19   is no longer used after the "establishing" step is performed.  (Akl Decl. ¶¶ 67-68.)

20       Again, BlackBerry's construction improperly imports limitations from a paragraph in the

21   specification that merely describes an illustrative embodiment.  ('231, col. 13:27-60.)  That paragraph

22   makes clear that it is merely describing one exemplary implementation: "*In one implementation*, a talk

23   tool establishes an active talk session using three communication channels: . . ."  (*Id.*, col. 13:27-28

24   (emphasis added).)  *Hill-Rom*, 755 F.3d at 1371-72 ("we do not read limitations from the embodiments

25   in the specification into the claims.").  This paragraph falls far short of establishing a clear disavowal

26   of claim scope or setting forth a binding definition of the term.  *Openwave*, 808 F.3d at 513; *Thorner*,

27   669 F.3d at 1365-67.

28

1

Dated:  July 11, 2019

COOLEY LLP

2

3

/s/ *Heidi L. Keefe*

4

HEIDI L. KEEFE (178960)
(hkeefe@cooley.com)

5

MARK R. WEINSTEIN (193043)
(mweinstein@cooley.com)

6

MATTHEW J. BRIGHAM (191428)
(mbrigham@cooley.com)

7

LOWELL D. MEAD (223989)
(lmead@cooley.com)

8

BENJAMIN S. LIN (232735)
(blin@cooley.com)

9

MARK A. ZAMBARDA (314808)
(mzambarda@cooley.com)

10

3175 Hanover Street
Palo Alto, CA  94304-1130

11

Telephone:    (650) 843-5000
Facsimile:    (650) 849-7400

12

13

COOLEY LLP
MICHAEL G. RHODES (116127)
(rhodesmg@cooley.com)

14

MATTHEW D. CAPLAN (260388)
(mcaplan@cooley.com)

15

101 California Street
San Francisco, CA  94111-5800

16

Telephone:    (415) 693-2000
Facsimile:    (415) 693-2222

17

18

Attorneys for Plaintiff
FACEBOOK, INC.

19

20

21

22

23

24

25

26

27

28

20.