UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

FACEBOOK, INC.,

    Plaintiff,

    v.

BLACKBERRY LIMITED,
a Canadian Corporation, and
BLACKBERRY CORPORATION,
A Delaware corporation,

    Defendants.

Case No. 4:18-cv-05434-JSW

**ORDER RE TENTATIVE RULINGS AND QUESTIONS RE MARKMAN HEARING**

Re: Dkt. No. 49

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD, PLEASE TAKE NOTICE OF THE FOLLOWING TENTATIVE RULING AND QUESTIONS FOR THE HEARING SCHEDULED ON NOVEMBER 21, 2019, AT 10:00 a.m.:

The Court has reviewed the parties' briefs and, thus, does not wish to hear the parties reargue matters addressed therein. If, at oral argument, the parties intend to rely on legal authorities not cited in their briefs, they are ORDERED to notify the Court and opposing counsel of these authorities reasonably in advance of the hearing and to make copies available at the hearing. If the parties submit such additional authorities, they are ORDERED to submit the citations to the authorities only, without argument or additional briefing. *Cf.* N.D. Civil. Local Rule 7-3(d). The parties will be given the opportunity at oral argument to explain their reliance on such authority. The Court suggests that associates or of counsel attorneys who are working on this case be permitted to address some or all of the Court's questions contained herein.

The parties shall each have approximately 60 minutes to present their respective arguments on claim construction. The Court provides its tentative constructions of the disputed terms of United States Patent Nos. 6,356,841 ("'841 Patent"), 6,744,759 ("'759 Patent"), 7,228,432 ("'432

1

Patent"), 7,302,698 ("'698 Patent"), 7,567,575 ("'575 Patent"), and 8,429,231 ("'231 Patent").

**A.    U.S. Patent No. 6,356,841**

    **1.    "central location" (claims 12 and 23)**

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction necessary at this time. Alternatively, if construction is needed, "location that communicates with the remote unit and is different from the remote unit." | "a single location that receives, stores, and analyzes GPS and other data from one or more remote unit" |

The term "central location" appears in asserted claims 12 and 23, as well as unasserted claims 1, 17, 29, and 36 of the '841 Patent. The '841 Patent uses the terms "central location" or "central office" to describe a component tracking multiple remote units (e.g., vehicles) using GPS. ('841 Patent, 1:33-41.)

The parties dispute (1) whether the term "central location" requires construction, (2) the functions performed by the central location, and (2) whether it can encompass a distributed solution, in which multiple locations scattered around the world perform the functions of the "central location." Facebook argues that no construction is needed because the plain and ordinary meaning of "central location"—where "central" means "that it can be in communication with one or more remote units"—is easily understandable to lay juries. BlackBerry argues that Facebook's own construction is "hardly 'plain and ordinary,'" which shows that a construction is necessary. BlackBerry further argues that its construction is necessary to clarify that the central location cannot be distributed into "multiple locations scattered throughout the world." Facebook argues that whether "distributed" components are at a central location is a factual determination for the jury to decide. Finally, Facebook accuses BlackBerry of importing limitations from the specification in requiring a location that "receives, stores, and analyzes" data and urges a broader construction found in the prosecution history.

The Court has the following questions:

(1)    Both parties agree that a central location may have multiple components (e.g., a GPS receiver, a processor) placed at different points in space within a central location, as shown in Figure 19. BlackBerry argues that the components must nevertheless be at a single location, rather

1   than "multiple locations scattered throughout the world."  In the Court's view, the term "location"

2   is unhelpfully vague and does not help clarify the question: at what point do components become

3   scattered enough that they are no longer at a single location?[1]  Moreover, the term "location"

4   appears to be used differently than its ordinary lay meaning.  In common parlance, a location—

5   such as the corner of 58th and Broadway or Baker Beach—performs no "communication" or data

6   processing.

7       In the interest of clarifying this dispute, can the parties propose a more precise term or

8   description in place of "location"?  Does Figure 19, perhaps, show an *integrated* set of

9   components acting together to form the central office/location?

10       (2)    The prosecution history shows that the claims were amended to replace "central

11   office" with "central location" to avoid confusion with a specialized meaning of "central office" in

12   the field of telecommunications networks.  What is the specialized meaning of "centralized office"

13   in telecommunications networks?  What is the broader, non-specialized meaning of "central

14   office" as used in the specification of the '841 Patent?

15       (3)    Despite using the term "central location," the '841 Patent does not appear to be

16   concerned with spatial centrality.  For example, the '841 Patent never discusses a particular place

17   or distance that the central office must occupy relative to the remote units.  Instead, the term

18   "central" appears to refer to logical centrality—the office/location receives and processes data

19   from multiple remote units in a hub-and-spoke manner—or else to functional centrality, where a

20   single system performs communication and data processing to track multiple remote units over

21   time.  Which of these interpretations is correct?  Can a "distributed" solution be "central" under

22   each interpretation?

23       (4)    The purported invention of the '841 Patent claims an improvement over GPS

24   systems where a "receiver is in constant communication with a network of GPS satellites" that "do

25   not allow centralized storage and processing of information."  ('841 Patent, 1:11-27.)  Does

---

[1] Facebook suggests that components can be at the same and different locations simultaneously. (Reply at 1:20-23.)  The Court encourages parties to provide clearer criteria for determining whether something is part of the central location.

Facebook's construction sweep in the prior art by allowing a network of GPS satellites that perform no centralized storage or processing in the central location?

The Court **tentatively** adopts the construction: "a single location having an integrated system that receives, stores, and analyzes GPS and other data from one or more remote unit."

## B.  U.S. PATENT NO. 6,744,759

### 2.  "feature"/"feature enhancement" (claims 4, 8)

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction is necessary at this time. | a telephony service provider offering or characteristic of a telephony service; "enhancement" means "an improvement" |

The terms "feature" and "feature enhancement"[2] appear in claims 1, 4, and 8 of the '759 Patent. The '759 Patent concerns adding "features" such as caller ID, call forwarding, and teleconferencing to a phone that connects to a data network (e.g., the Internet).

The main dispute between the parties is whether the claimed "features" are limited to features of telephony service. BlackBerry argues that the '759 Patent consistently describes telephony features and services, such as CLASS and PBX features. (*See, e.g.*, '759 Patent, 1:16-2:47, 3:23-31.) The specification further describes the advantages of the "present invention" as adding "telephone" features into a "data network telephony system" and to "telephony service." (*Id.*, 3:23-42.) Facebook replies that nothing in the claims or specification limits "features" to telephony service offerings or characteristics or disavows other types of features. Facebook argues that the terms "feature" and "feature enhancement" are easily understood by lay juries and do not require construction.

The Court has the following questions:

(1)  Assuming that the Court determines that "features" are not limited to offerings or characteristics of telephone service, do the parties dispute any other aspect of the "plain meaning" of the terms "feature" and "feature enhancement"? If yes, could both parties provide their

---

[2] BlackBerry initially asked to construe "enhancement" as "an improvement," but does not argue for this construction and is willing to withdraw its proposed construction if "the Court agrees . . . that a layperson would not require any guidance" on this term. The Court agrees.

1  interpretation of the "plain meaning" of those terms?

2  The Court **tentatively** adopts the construction: "plain and ordinary meaning, which is not

3  limited to telephony service offerings or characteristics."

**3.      "data network telephone" (claims 4, 8)**

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction necessary at this time. | A fixed communications device with a communications interface for connection to a data network. |

The term "data network telephone" appears in claims 1-4, 6, 8, and 10 of the '759 Patent. The '759 Patent explains that a "data network" can be the Internet, and a "data network telephone" is a telephone that transmits digitized voice as data through the Internet. ('759 Patent, 2:66-3:25.)

The parties dispute whether the claimed telephone must be a "fixed" device. BlackBerry argues that the embodiments show the "data network telephone" as a fixed device, and the specification explicitly states that "[t]he fixed communication device of the present invention is not limited to telephones or videophones." (*Id.*, 8:17-36, 9:36-38, 12:3-38, 15:11-22, Fig. 2A.) Facebook responds that BlackBerry's construction improperly imports limitations from the specification. The parties also dispute whether the potentially wireless "voice communication device" shown in Figure 1 is a "data network telephone."

The Court has the following questions:

(1)     The specification of the '750 Patent describes two types of Internet phones: (i) a type that connects through a telephony gateway/terminal and "is no more flexible than the PSTN with respect to providing enhancements and features to the basic telephone service," and (ii) another type that connects to the Internet through access networks and is "substantially more intelligent." ('759 Patent, 2:66-3:22.) What is the difference between these two types of Internet phones? Does a "data network telephone" refer to one or both them?

The Court **tentatively** adopts the construction: "a telephone that can work with a data network, such as the Internet."

//

5

### C. U.S. PATENT NO. 7,228,432

#### 4. "dedicated security processor" (claim 1)

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction is necessary at this time. | a processor dedicated to providing security functions |

The term "dedicated security processor" appears in claims 1, 5, 6, and 26-29 of the '432 Patent. The '432 Patent describes using a dedicated security processor to access, validate, and provide a file to another processor to ensure security. Claims 9-21 only require a "security processor," not a "dedicated" security processor.

The parties dispute whether the "dedicated security processor" must be dedicated to providing security. BlackBerry argues that, by the plain meaning of the term, it does. BlackBerry further points out that the '432 Patent purports to provide an advantage of freeing up the CPU by delegating security functions to a separate processor, which then validates and provides the CPU with files that have been found to be secure. ('432 Patent, 1:40-46, 2:18-21, 2:30-44, 4:11-35.) Finally, BlackBerry argues that the term "dedicated" would be rendered superfluous if there was no difference between a "dedicated security processor" and a "security processor." Facebook argues that no construction is necessary but provides no interpretation of this term and no explanation of what a dedicated security processor could be dedicated to, if not security.

The Court has the following questions:

(1) BlackBerry's construction appears to be one of only two reasonable constructions, the other being "a security processor dedicated to accessing and validating a file"—the functions recited in the claims. Would Facebook prefer this narrower construction?

The Court **tentatively** adopts the construction: "a processor dedicated to providing security functions."

//
//
//
//

D.  **U.S. PATENT NO. 7,302,698**

  5.  **"operating state" (claim 1); "operational state" (claim 20)**

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No separate construction necessary at this time beyond agreed construction of "state." | a state running on the computing entity that can be distinguished from other states using a set of integrity metrics |

The terms "operating state" or "operational state" appear in asserted claims 1 and 20 and unasserted claims 3, 6, 13, and 21.

The parties agree that that the '698 Patent defines "state" as "a mode of operation of the computing entity in which a plurality of functions provided by the computing platform may be carried out." ('698 Patent, 12:65-13:2.) Facebook argues that no further construction is needed. BlackBerry argues that a non-construction would vitiate the claim limitation of "operational" and "operating" by allowing an "operating/operational state" to mean the same as "state," which reads out "operational" and "operating." Instead, BlackBerry proposes to construe "operating state" as (1) running on the computing entity, and (2) being distinguishable from other states using a "set of integrity metrics." The latter requirement comes from the prosecution history, where the applicant appealed a rejection over prior art that taught "operating systems."

The Court has the following questions:

(1) The '698 Patent uses the word "state" in some claims and "operating state" or "operational state" in others. (*E.g.*, '698 Patent, claims 2, 6, 7, 12.) Does BlackBerry's construction explain the variation in the use of "state" versus "operating/operational state"? Put differently, does BlackBerry contend that the claims use "operating/operational state" to refer to states that are running and can be distinguished using integrity metrics, and "state" to refer to states that are *not* running or *cannot* be distinguished using integrity metrics?

(2) During prosecution, the applicant disclaimed "operating systems" from the required states. (Dkt. 49-2, Appeal Brief to the Board of Patent Appeals and Interferences ("Appeal Br.") at 13.)[3] Does the agreed-to definition of "state" encompass operating systems?

---

[3] The record does not contain sufficient information to determine the reason for the disclaimer. As the party seeking disclaimer, the Court requests that BlackBerry provide the underlying office

(3) The applicant stated in an Appeal Brief that operating states can be distinguished from other operating states "using a set of integrity metrics *designed to distinguish between those states*." (Appeal Br. at 13 (emphasis added).) How are integrity metrics "designed" to distinguish between operating states? The specification describes a trusted component that compares measured integrity metrics to pre-stored values to verify that computer is operating correctly in the trusted state. ('698 Patent, 20:34-52.) Can two operational states have the same level of trust and be satisfied by the same integrity metrics? (*See id.*, 12:49-53.)

The Court **tentatively** adopts the construction: "'state' and 'operating/operational state' both mean 'a mode of operation of the computing entity in which a plurality of functions provided by the computing platform may be carried out,' but neither term can be satisfied by an operating system."

### 6. Preamble of claim 20

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| The preamble is not limiting except for "computer program" [sic] and "monitoring component having a second data processor and a second memory" | The phrase "a computer platform having a first data processor and a first memory" and "a monitoring component having a second data processor and a second memory" in the preamble of claim 20 is limiting. |

The preamble of claim 20 of the '698 Patent recites:

[a] method of storing data at a computing entity comprising a computer platform having a first data processor and a first memory and a monitoring component having a second data processor and a second memory,

The parties dispute the portions of the preamble that are limiting (i.e., serve as limitations). A preamble is generally not limiting, except to the portions that, for example, provide an antecedent basis for other terms or "recite essential structure or steps." *Georgetown Rail Equip. Co. v. Holland L.P.*, 867 F.3d 1229, 1236 (Fed. Cir. 2017). Here, the parties agree that "computer program" and "monitoring component having a second data processor and a second memory" are

---

action at issue in the appeal, as well as any responses and decision issued in the appeal.

8

limiting because they provide antecedent basis to other terms,[4] but disagree on "having a first data processor and a first memory." Under Facebook's construction, the underlined portions of the preamble shown below are limiting, but the italicized portion is not:

> [a] method of storing data at a computing entity comprising **a computer platform** *having a first data processor and a first memory* and **a monitoring component having a second data processor and a second memory**,

BlackBerry argues that the "a computer platform having…" is a single limitation providing an antecedent basis for the other terms in the claim. BlackBerry further argues that a computer platform having a processor and memory is both highlighted as an important part of the specification and is part of the express definition of "computer platform" provided by the specification, which renders it "essential." ('698 Patent, 7:56-67.) Facebook argues that the claims recite a structurally complete invention without the additional limitations.

The Court **tentatively** adopts the construction: "the phrases 'a computer platform having a first data processor and a first memory' and 'a monitoring component having a second data processor and a second memory' in the preamble of claim 20 are both limiting."

E.  **U.S. PATENT NO. 7,567,575**

7.  **Order of methods steps (claim 1)**

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| The sequence of steps can be performed in any order, except that the step of "receiving a request…" is performed before the step of "providing multimedia data to the mobile device…" | The claim requires the step of "receiving a request from the mobile device" to occur before the subsequent limitations in the claim. |

Claim 1 of the '575 Patent recites a method for providing multimedia data to a mobile device. Broadly, the claim recites receiving a request from a mobile device, determining the user and device profile, authenticating the user, authorizing control and access, providing a control channel, and providing the multimedia data to the mobile device, along with other steps.

---

[4] During prosecution, "monitoring component having a second data processor and a second memory" was cited as a distinction over prior art, which is another basis for finding a preamble clause limiting. *Georgetworn Rail Equip.*, 867 F.3d at 1236.

9

The parties dispute whether a particular order of steps is required. A method claim is generally not construed to require an order of steps, unless there is affirmative evidence to the contrary, for example, where the logic or grammar of the claims requires a particular order. *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 F. App'x 603, 609 (Fed. Cir. 2007). Here, BlackBerry argues that receiving the request from the mobile device must occur before all subsequent claim limitations because the specification consistently describes the "requesting" step as occurring before the other steps. (*See* '575 Patent, Fig. 5, 4:13-15, 4:46-48.) Facebook contends that the "receiving a request" must only occur before the step of "providing multimedia data to the mobile device in response to the request…" because that step specifically references the "request" from the "receiving a request" step. Facebook further argues that claim 1 uses the open-ended "comprising" language, and that some steps may logically precede the "receiving a request" step. For example, a user may be pre-authorized to receive multimedia data.

The Court **tentatively** adopts the construction: "The sequence of steps can be performed in any order, except that the step of 'receiving a request…' is performed before the step of 'providing multimedia data to the mobile device….'"

### 8. "multimedia data delivery information" (claim 1)

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction necessary at this time. Alternatively, if construction is needed, "information relating to the delivery of multimedia data." | The phrase is indefinite |

The term "multimedia data delivery information" appears in claim 1 of the '575 Patent. The term "multimedia data delivery information" appears in the specification without substantial explanation of what the term means. ('575 Patent, Abstract, 14:10-12, 2:67-6:3, Fig. 5.)

The parties dispute whether the term is indefinite. BlackBerry argues that the metes and bounds are unknowable because the term "multimedia data deliver means" has no plain meaning, and the specification does not explain what the term covers. Facebook argues that the plain meaning is clear and that the plain meaning is information about delivery of multimedia data. Facebook relies on the opinion of its expert and an inventor of the '575 Patent to argue that a

10

person of ordinary skill in the art would have understood the term to encompass information such as: origin and destination addresses, date and time of delivery, and the type of multimedia data.

The Court **tentatively** adopts the construction: "information related to the delivery of multimedia data."

### 9. "mobile device transmission profile" (claim 1)

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction necessary at this time | A profile containing information that describes the wireless protocol used by a mobile device, including the wireless channel environment of the mobile device |

The term "mobile device transmission profile appears in asserted claim 1 and unasserted claims 11 and 12 of the '575 Patent. The '575 Patent describes using the "mobile device transmission profile" to adapt data transmission to the mobile device. ('575 Patent, 13:63-67)

The parties dispute whether the term requires construction. Facebook argues that it does not and suggests that the plain meaning of the term—transmission profile of a mobile device—is clear. BlackBerry argues that the term has no plain meaning and, indeed, no meaning at all outside of the '575 Patent. BlackBerry reasons that the term should be construed in light of the specification, which states that "[t]he transmission profile describes the protocol of the wireless channel environment" and aims to adapt transcoding and transmission techniques to the characteristics of the mobile device and wireless channel environment. ('575 Patent, 2:26-35, 7:11-21.)

The Court has the following questions:

(1) Is a wireless channel environment a subset of the wireless protocol used by a mobile device? If not, should the "including" in BlackBerry's construction be an "and"?

The Court **tentatively** adopts the construction: "A profile containing information about transmission characteristics of a mobile device, including the wireless protocol and the wireless channel environment of the mobile device."

//

11

### F. U.S. PATENT NO. 8,429,231

#### 10. "generic signaling interface channel"

| Facebook's Proposed Construction | BlackBerry's Proposed Construction |
|---|---|
| No construction necessary at this time. Alternatively, if construction is needed, "communication channel that can be used to establish an initial connection." | A channel used to establish an initial connection in which local IP addresses are exchanged, and then is no longer used. |

The term "generic signaling interface channel" appears in claim 1 of the '231 Patent. The '231 Patent describes establishing a voice communication over instant messaging using three channels: a generic signaling interface channel, a control channel, and an audio channel. ('231 Patent, 13:27-38.)

The parties dispute the amount of specification to use in the construction of the term. The term "generic signaling interface channel" ( "GSI channel") appears primarily in one paragraph of the '231 patent, which states:

> In one implementation, a talk tool establishes an active talk session using three communication channels: a Generic Signaling Interface (GSI) channel, a control channel, and an audio channel. *The talk tool uses the GSI channel to establish the initial connection.* During this connection, *the local IP addresses are exchanged.* After the initial connection phase is done, *the GSI channel is no longer used.* By using the GSI channel, the exchange of local IP addresses is only done when both parties permit such an exchange, i.e., by clicking on the CONNECT UI. These actions protect users from having their local [I]P addresses automatically obtained without their consent.

('231 Patent, 13:27-38 (emphasis added).)

BlackBerry argues that all three described functions should be used to construe the GSI channel, which does not appear to have any meaning outside of the '231 Patent. Facebook argues that no construction is necessary and proposes "communication channel that can be used in an initial connection" in the alternative—effectively importing one sentence from the specification. Facebook argues that BlackBerry is improperly importing limitations by considering the other sentences and again argues that there has been no disclaimer.

The Court has the following questions:

(1) The specification implies that the unique advantage of using a GSI channel is that "the exchange of local IP addresses is only done when both parties permit such an exchange."

12

('231 Patent, 13:33-36.) Neither party's construction accounts for this advantage. Is there a construction that would properly capture this aspect of using a GSI channel?

(2) The plain meaning of "generic signaling interface channel" suggests a channel that is "generic" and provides or connects a "signaling interface," or else provides for "signaling" and an "interface." Figure 6 shows several interfaces, such as CONNECT_UI, and describes steps for signaling through those interfaces. The specification states that the GSI channel allows users to permit an exchange of IP addresses by clicking on CONNECT_UI. Where does the GSI channel fit in the method of Figure 6?

The Court **tentatively** adopts the construction: "a channel used to establish an initial connection in which local IP addresses are exchanged if the parties permit such an exchange."

## CONCLUSION

The parties are ORDERED to meet and confer to attempt to narrow their disputes and to give notice of their intended proposals where the Court has asked for additional or alternative constructions no later than October 24, 2019. BlackBerry is further ORDERED to submit the October 11, 2006 office action appealed in Exhibit 2, as well as any response and decision resulting from that appeal no later than October 24, 2019.

**IT IS SO ORDERED.**

Dated: October 22, 2019

_____
JEFFREY S. WHITE
United States District Judge